IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 9, 2019

## CORDRICUS ARNOLD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-03894    W. Mark Ward, Judge

_____

### No. W2018-01187-CCA-R3-PC

_____

The petitioner, Cordricus Arnold, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

J. Jeffrey Lee, Memphis, Tennessee, for the appellant, Cordricus Arnold.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Holly Palmer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

In 2013, the petitioner stabbed his victim to death, and a jury later convicted him of first degree felony murder. The defendant challenged the sufficiency of the evidence supporting his conviction and the trial court's failure to instruct the jury on voluntary manslaughter on direct appeal. In denying relief, this Court summarized the facts surrounding the murder, as follows:

> This case arose after the victim was stabbed behind a Memphis restaurant. In a statement to police, the [petitioner] said that on the evening of March 23, 2013, he was in a Kroger grocery store "[t]o get warm." The

Kroger was in the same shopping center as the restaurant El Toro Loco, and the store was adjacent to the restaurant. The [petitioner] said that he was wearing a "[b]lack hoodie and some black pants and some orange and gray shoes," and video footage from the store depicted the [petitioner] in this attire. The [petitioner] exited the store without making a purchase, and he "went to the back of Kroger and just sat there." While sitting behind the store, the [petitioner] noticed the victim, who worked at El Toro Loco, when the victim was taking out the trash. The [petitioner] approached the victim when he was emptying bottles and boxes into the trash. The [petitioner] said that the victim turned around "because I guess he saw a shadow and he tried to use the bottles to hit me with them. I guess he realized what I was fixing to do." The [petitioner] then pulled out a knife and stabbed the victim with a "[b]lack butcher knife." The victim ran into the restaurant, and the [petitioner] said that he followed him in an attempt to find the victim's car keys. He explained that he wanted to obtain the victim's keys so that he would have a place "to lay [his] head."

Video footage from inside the restaurant showed the victim loading boxes into a cart and then pushing the cart toward the rear exit of the restaurant. A little over one minute later, the victim came back into the restaurant and collapsed writhing on the floor. Shortly thereafter, the [petitioner] came into the restaurant. The footage showed that he was holding a butcher knife and wearing a black hoodie and black pants, and the footage clearly shows the [petitioner's] face. The video captured the [petitioner] placing the knife on a counter and walking from one end [of] the kitchen to the other several times. The [petitioner] then retrieved the knife and knelt over the victim's body. The [petitioner] stated that he took the victim's keys and wallet and left in the victim's vehicle, which he described as a "[g]reen" truck.

Jose Miranda testified that he worked at El Toro Loco with the victim. He testified that the victim drove a green RAV 4 and that he usually parked behind the restaurant. He stated that on the evening of the victim's death, he and the victim were cleaning up the restaurant, and the victim went outside alone to take some boxes to the dumpsters behind the restaurant. A short time later, the restaurant supervisor asked Mr. Miranda if he knew where the victim was, and Mr. Miranda replied that he did not. Mr. Miranda went to look for the victim in the back of the restaurant and found him lying dead on the floor in the kitchen. Mr. Miranda rushed back to his manager and told him to call the police.

Members of the Memphis Police Department ("MPD") homicide bureau and crime scene unit were dispatched to the scene. Sergeant Kevin Lundy obtained footage from the cameras in the restaurant, and he had a video analyst create still photographs from images in the videos. Sergeant Lundy contacted Cecil Wages, who was a loss prevention officer for Kroger and a reserve MPD officer, and provided him with a still photograph of the [petitioner] from inside the restaurant. Mr. Wages examined the footage from the Kroger adjacent to El Toro Loco, and he discovered that a person matching the [petitioner's] description was in the Kroger about two hours before the victim was stabbed. Mr. Wages sent the video to the homicide bureau, and they verified that the person in the video was their suspect.

Four days after the killing, Sergeant Robert Wilkie received a call informing him that the victim's vehicle was parked behind El Toro Loco. Officers recovered the vehicle, and Officer Michael Coburn processed the vehicle. He discovered the victim's wallet and credit card in the cupholder of the vehicle. He also tested the vehicle for fingerprints, and he sent eight samples to the latent print unit.

Officer Nathan Gathright, who worked in the latent print unit, testified that he compared the fingerprints taken from the victim's vehicle to the [petitioner's] fingerprints. Of the eight prints recovered, he identified three as a positive match to the [petitioner]. After learning of the match, Sergeant Lundy began investigating the [petitioner] and ascertained his home address. Officers went to the home, where they spoke with L.C. Townsend.

Mr. Townsend testified that he used to live with the [petitioner's] mother, the [petitioner], and several other family members. At the beginning of March, the family moved into a new residence. Around two or three weeks later, the [petitioner] moved out of the residence and stopped spending the night. At the time, he did not have a car. Mr. Townsend testified that the [petitioner] returned nearly a week later, and he was driving a green RAV 4. He testified that the shopping center containing the Kroger and El Toro Loco was a seven to ten minute walk from the residence.

Officers learned that the [petitioner] was possibly working at a Honeybaked Ham, and Sergeant Lundy dispatched a task force, which included Officer William Lane, to arrest the [petitioner]. Officer Lane

testified that when he arrived at the eatery, he was told that the [petitioner] was not there. Officers looked around the restaurant for several moments, and they saw the [petitioner] exit a broom closet and race out the back door. Officer Lane and his partner pursued the [petitioner] for one and a half miles on foot. When officers apprehended the [petitioner], a struggle ensued. Officer Lane testified that the [petitioner] kicked him in the chest and another officer in the face before he was subdued. Officers then took him to "the Med" to be examined, and he was treated for very minor injuries.

After leaving the hospital, the [petitioner] was taken to the precinct, where he spoke with Sergeant Lundy. The [petitioner] waived his *Miranda* rights, and he told Sergeant Lundy that he was responsible for the victim's death. In addition to the details surrounding the stabbing of the victim, the [petitioner] said that he returned the knife to his mother's home. He explained that he returned the truck to the restaurant after he learned that authorities were searching for the vehicle. He stated that he "wiped the steering wheel, door handle, and the front seat" before returning the vehicle in an effort "to erase evidence." He said that he left the key in the driver's seat of the vehicle. He stated that he was not attempting to kill the victim and that he wished the victim had not died.

The [petitioner] did not put on any proof. The jury convicted the [petitioner] of first degree (felony) murder, and the trial court sentenced him to life imprisonment.

*State v. Cordricus Arnold*, No. W2015-00702-CCA-R3-CD, 2016 WL 1705210, at *1-2 (Tenn. Crim. App. Apr. 26, 2016), *perm. app. denied* (Tenn. Oct. 24, 2016) (not for citation).

The petitioner filed a timely, pro se petition for post-conviction relief which he amended after the appointment of counsel. In the amended petition, the petitioner argued trial counsel was ineffective for failing to: (1) introduce a picture "showing the physical abuse [the petitioner] encountered during his apprehension" to establish his confession was given under duress; (2) "introduce evidence sufficient to obtain a jury instruction regarding adequate provocation;" and (3) "secure a jury instruction for the offense of voluntary manslaughter as a lesser offense of felony murder." Both the petitioner and trial counsel testified at the subsequent evidentiary hearing.

- 4 -

The petitioner stated he detailed the circumstances surrounding his arrest to trial counsel prior to trial.[1] In doing so, the petitioner explained, "that the police[] came to the job site, tried to arrest me, I ran. . . . I got pistol whipped in the backyard and then after I got pistol whipped they proceeded -- 15 officers proceeded to jump on me with their baton or whatever and they took me to medical." The petitioner suffered two black eyes and injury to his nose which required stitches. The petitioner left the hospital after "about six to eight hours" and proceeded immediately to the police station where he was interviewed. During the interview, the petitioner admitted to killing the victim and also claimed the victim attacked him with a bottle prior to the stabbing.

At the evidentiary hearing, the petitioner explained he was in pain during the interview which affected his statement. He also stated, "I was scared [the police would] probably attempt to do something else again if I prolong[ed] or I didn't give them what they wanted or whatever." According to the petitioner, trial counsel failed to present a photograph to the jury that showed the injuries he suffered as a result of the police beating. The petitioner asked trial counsel "what happened to the pictures," but the pictures did not come up at trial.[2] The petitioner did not know if trial counsel filed a motion to suppress his statement but recalled trial counsel wanted the statement to "come in" in order to present his version of events to the jury. Based upon trial counsel's advice, the petitioner chose not to testify at trial.

The petitioner then addressed trial counsel's handling of the lesser-included offenses applicable to his case. He stated trial counsel requested a jury instruction on negligent homicide and voluntary manslaughter, but the trial court denied the request and ultimately ruled no lesser-included offenses applied.[3] The petitioner did not remember trial counsel's asking him to waive his right to be formally indicted for voluntary manslaughter in order to have it charged to the jury. He entered two cases into evidence that, according to him, "allowed lesser[-]included offenses like voluntary manslaughter, negligent homicide and stuff like that."

Trial counsel also testified, noting the evidence against the petitioner was overwhelming. Not only did the petitioner confess to killing the victim, but also the petitioner's fingerprints were found on the victim's car and the petitioner's mother's boyfriend saw the petitioner driving the victim's car. Additionally, video evidence clearly showed "what happened and who did it" on multiple video cameras surrounding the location of the murder. Though the actual stabbing was not captured, the videos

---

[1] It is unclear from the record who served as lead counsel, but only one attorney testified at the evidentiary hearing. As a result, we will refer to the testifying attorney as trial counsel.

[2] The photograph at issue was entered into evidence at the hearing.

[3] The post-conviction court, however, interjected and clarified that it instructed the jury on second degree murder as a lesser-included offense.

showed "everything leading up to [the stabbing] and you can see everything afterward," including the petitioner "going into [the victim's] pockets and getting [the victim's] keys out of his pockets while he's laying (sic) on the ground in blood trying to move his body, like trying to I guess cling on to life." As a result, trial counsel "thought [the petitioner's] statement should come in" and she "knew that suppressing the statement would not mean that they could no longer tie [the petitioner] to this crime."

Trial counsel utilized the statement to the petitioner's benefit by identifying that the petitioner said "the victim was coming at him with a bottle" and "he did not mean to kill [the victim]." Strategically, trial counsel wanted the jury to know:

> When [the petitioner] in his statement said that [] the victim turned around with a bottle and that he got scared, that, it wasn't supposed to happen like this and that he had the knife already for protection, not because he intended to kill somebody, but that it was a split-second decision to take out the knife when he turned around and that he was sorry that a person was dead.

Trial counsel knew an "adequate provocation" defense was "a stretch . . . [b]ut that was the only thing that we could even reasonably try to do." Thus, trial counsel highlighted additional "bits and pieces" of testimony from officers, including that there were bottles on the ground, "to kind of piece together for some kind of fight that happened." She also cross-examined the petitioner's mother's boyfriend about the petitioner's family situation and how he "was kind of pushed out of the family" to complete the petitioner's story and again highlight that he did not mean to kill anyone. Trial counsel introduced testimony from a police officer regarding the petitioner's attempt to commit suicide while in custody in an effort to show the petitioner did not intend to kill the victim. Concerning the strategy presented at trial, trial counsel stated, "I feel like based on the facts that I could not change, based on the evidence that I knew was coming in, based on everything that I read about the case, that that was the best strategy."

Additionally, trial counsel "was very well aware of what happened when [the petitioner] was arrested." She explained the petitioner put the police through "quite a lengthy chase" and "that there was a struggle" after which the petitioner was treated and questioned. She did not remember if pictures from the arrest were a part of the petitioner's medical records but noted the petitioner's injuries "were not extensive," he was not hospitalized for long, he was only given "Tylenol or Advil or something like that," and he was initially charged "with evading arrest and some other offenses related to that part of the arrest." Trial counsel did not think a photograph showing the petitioner's injuries was relevant because she believed it was clear the petitioner was injured during

- 6 -

his arrest. Furthermore, she did not want to highlight the fact that the petitioner did not turn himself in after the murder or that he ran from police as they tried to arrest him.

Trial counsel then addressed the lesser-included offenses applicable to the petitioner's case, noting "there was a distinction with regard to the voluntary manslaughter about whether it was in fact a lesser[-]included of felony murder even though it may be a lesser[-]included of intentional or first degree murder." Regardless, trial counsel requested second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide to be charged to the jury. Trial counsel relied on case law and statutes "to get voluntary manslaughter included as well as the other lesser[s]," but after a "somewhat lengthy hearing about the voluntary manslaughter offense in particular," the trial court ruled second degree murder was the only lesser-included offense applicable.

After its review of the evidence presented, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proof to show the ineffective assistance of counsel. The petitioner timely appealed.

### *Analysis*

On appeal, the petitioner asserts the outcome of his trial would have been different absent the deficiencies of trial counsel. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

First, the petitioner argues trial counsel was ineffective for failing to introduce a photograph showing the injuries he suffered upon arrest. The petitioner suggests trial counsel should have utilized the photograph in support of a motion to suppress "his admission made during an interrogation in which he was beaten, treated for injuries, and medicated immediately preceding the interrogation, which he contends resulted in a waiver of *Miranda* rights that was not knowing and voluntary based on his mental and physical state." The post-conviction court determined "trial counsel's strategy in this case wanted the [petitioner's] statement entered into evidence because it helped his case more than hurt his case" and that "trial counsel made a strategic decision not to [emphasize] the injuries the [petitioner] received because she did not want any further

- 8 -

emphasis on his flight and resistance to arrest." Upon our review, we agree with the assessment of the post-conviction court.

The record indicates the petitioner admitted in a statement made after his arrest to stabbing the victim. The arrest occurred after the petitioner ran from police and led them on a lengthy chase. The petitioner was treated for his minor injuries and then interrogated. Along with the statement of admission, the petitioner also faced finger-print and video evidence tying him to the murder. In the statement, however, the petitioner also made several comments which explained his state of mind and his interactions with the victim prior to the murder. As a result and based upon the overwhelming amount of evidence against the petitioner, trial counsel made a strategic decision to use the petitioner's statement to aid in his defense, arguing the petitioner acted in self-defense because the victim came after him with a bottle. The petitioner has failed to show how the introduction of a photograph depicting the injuries he suffered upon arrest would have affected the outcome of his trial as trial counsel testified she hoped to minimize the petitioner's behavior during arrest while highlighting his version of events through his statement. This Court will not second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley*, 960 S.W.2d at 579. The petitioner is not entitled to relief as to this issue.

Secondly, the petitioner asserts trial counsel was ineffective for failing to "obtain a jury instruction of voluntary manslaughter for the jury's consideration." In reviewing this issue, the post-conviction court found trial counsel did "request such an instruction and the request was refused by the trial [court] on the basis that (a) voluntary manslaughter was not a lesser-included offense and (b) the evidence was insufficient to establish either adequate provocation or that [the petitioner] was acting in a state of passion." As a result, the post-conviction court held the petitioner "has identified no actions or inactions on the part of trial counsel with regard to requesting an instruction on voluntary manslaughter." Again, we agree with the findings of the post-conviction court.

The record makes clear trial counsel requested an instruction on voluntary manslaughter, researched case law and statutes to support the same, and argued the issue before the trial court on behalf of the petitioner. Trial counsel also elicited testimony, including that officers saw bottles in the area of the murder and that the petitioner was suffering from a bad family situation at the time of the murder, in the hopes of warranting an instruction on voluntary manslaughter. The fact the trial court denied trial counsel's request does not make her performance deficient, and nothing in the record demonstrates

trial counsel's strategy regarding lesser-included offenses was not sound.[4] *Strickland*, 466 U.S. at 689. The petitioner is not entitled to relief.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

---

[4] We note that on direct appeal, this Court reviewed whether the petitioner's claim concerning voluntary manslaughter was a lesser-included offense of first degree felony murder and held the trial court did not err in determining voluntary manslaughter was not a lesser-included offense. *Cordricus Arnold*, 2016 WL 1705210, at *4-5.